Alfred A. Day (Mass. Bar. No. 654436)
daya@sec.gov
(617) 573-4537
Timothy K. Halloran (D.C. Bar No. 483245)
hallorant@sec.gov
(202) 551-4414

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Facsimile:  (202) 772-9292

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATHANIEL BROWN, BENJAMIN WYLAM, NAVEEN SOOD, MARCUS BANNON, MATTHEW RAUCH, and NARESH RAMAIYA,<br><br>Defendants. | **COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), alleges the following:

## SUMMARY

1. This is an insider trading case.  In 2016 and 2017, Defendants Nathaniel Brown, Benjamin Wylam, Naveen Sood, Marcus Bannon, Matthew Rauch, and Naresh Ramaiya engaged in an insider trading scheme involving the securities of Infinera Corporation ("Infinera") and Fortinet, Inc. ("Fortinet").  As a result of the scheme, Defendants obtained nearly $1.7 million in illegal profits and losses avoided.

2.      Wylam, who made more than $1 million in illicit profits, admitted that he engaged in insider trading.  On an Internet message board, Wylam stated that he had "friends" at publicly-traded companies in Silicon Valley and that "*Insider trading is part of my investment strategy*."  (Emphasis added.)

3.      From at least April 2016 through November 2017, Wylam regularly sought inside information from his close friend, Brown, who worked at Infinera.  Brown, in violation of his duty of confidentiality to Infinera, repeatedly gave Wylam material nonpublic information regarding Infinera's upcoming quarterly financial results and guidance.  Wylam used the material nonpublic information to trade Infinera securities and passed the information to Sood, who also traded on the information.  Sood, in turn, passed the information to Bannon, Rauch, and Ramaiya, who also used it to trade.

4.      Wylam, Sood, Bannon, Rauch, and Ramaiya (collectively, the "Infinera traders") knew, consciously avoided knowing, or were reckless in not knowing, that the material nonpublic information they received was obtained from an Infinera insider (Brown) in breach of his duty of confidentiality to the company.  The Infinera traders used the material nonpublic information to purchase and sell Infinera securities ahead of the company's public earnings announcements.  In total, the Infinera traders reaped approximately $1.4 million in illicit profits and losses avoided from insider trading around several Infinera earnings announcements.

5.      In October 2016, the scheme expanded to include trading in the securities of Fortinet, the company where Bannon worked.  While employed by Fortinet, Bannon learned that the company planned to make an unexpected, preliminary earnings announcement, and that the news would be negative.  In violation of his duty of confidentiality to Fortinet, Bannon tipped that material nonpublic information to his longtime friend, Sood, who used it to trade, and then passed it along to Wylam and Ramaiya, who also traded on the information.

6.      Sood, Wylam, and Ramaiya (collectively, the "Fortinet traders") knew, consciously avoided knowing, or were reckless in not knowing, that the material nonpublic information was obtained from a Fortinet insider (Bannon) in breach of his duty of

confidentiality to the company.  The Fortinet traders used the material nonpublic information to purchase and sell Fortinet securities ahead of the company's public earnings announcement. Together, the Fortinet traders made more than $270,000 in illicit profits from insider trading around a single Fortinet earnings announcement.

7.      By engaging in the conduct described herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

8.      Because of Defendants' violations, the SEC seeks permanent injunctive relief, civil monetary penalties, and any further relief that the Court deems appropriate.

**JURISDICTION AND VENUE**

9.      The Court has jurisdiction over this action pursuant to Sections 21, 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u, 78u-1, and 78aa.

10.     Venue is proper in this judicial district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, because certain of Defendants' acts constituting the violations alleged herein, including tipping and trading on material nonpublic information, occurred in this district. Additionally, Defendants Brown, Wylam, Sood, Bannon, and Ramaiya reside in Santa Clara County, within this district.

11.     Assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-2(c) and (e) because a substantial part of the events or omissions giving rise to the SEC's claims occurred in Santa Clara County, and most Defendants reside within that county.

12.     Defendants, directly or indirectly, used the means or instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, in connection with the violations alleged in this Complaint.

**DEFENDANTS**

13.     **Nathaniel Brown**, age 49, resides in San Jose, California.  Brown is a citizen of New Zealand and a lawful permanent resident of the United States.  From approximately September 2011 until November 2017, Brown worked as a senior revenue manager at Infinera.

At all relevant times, Brown maintained a close personal friendship with Wylam.  Brown provided sworn investigative testimony to the SEC, and portions of that testimony are quoted herein.

14.    **Benjamin Wylam**, age 42, resides in San Jose, California.  At all relevant times, Wylam and Brown were close friends.  After Brown gave Wylam the tips of inside information described herein, Wylam served as the best man in Brown's wedding.  From at least April 2016 through the present, Wylam has worked as a high school teacher in Santa Clara, California.  During the period of time alleged in this Complaint, Wylam also acted as a bookmaker, taking bets on sporting events from various people, including Sood and Bannon.  When the SEC subpoenaed Wylam for investigative testimony, Wylam invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions about, among other things, his trading in Infinera and Fortinet securities and his tipping others with material nonpublic information about those companies.

15.    **Naveen Sood**, age 49, resides in Campbell, California.  At all relevant times, Sood was a close friend of Brown, Wylam, Bannon, and Ramaiya.  In or around August 2015, Sood owed Wylam a gambling debt of more than $100,000.  Sood also owns and operates an equipment leasing and financing company that employs Ramaiya.

16.    **Marcus Bannon**, age 47, resides in Los Gatos, California.  Since approximately January 2011, Bannon has been a major account manager at Fortinet.  Bannon and Rauch have been close friends since they were college roommates in the 1990s.  After college, Bannon became friends with Sood, who Bannon introduced to Rauch.  At all relevant times Bannon, Sood, and Rauch were close friends, and they periodically took trips together.  Bannon also placed sports bets with Wylam.  When the SEC subpoenaed Bannon for investigative testimony, Bannon invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions about, among other things, his trading in Infinera and Fortinet securities and his tipping others with material nonpublic information about those companies.

17.     **Matthew Rauch**, age 47, resides in Costa Mesa, California.  At all relevant times, Rauch was a close friend of Sood and Bannon.

18.     **Naresh Ramaiya**, age 41, resides in San Jose, California.  From approximately 2001 to the present, Ramaiya has been employed by the equipment leasing company owned by Sood.  Ramaiya and Sood also are close friends.

## RELEVANT ENTITIES

19.     **Infinera Corporation** is a Delaware corporation with its headquarters in Sunnyvale, California.  Infinera provides networking solutions in the telecommunications sector. Infinera's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and it trades on the NASDAQ exchange under the ticker "INFN."

20.     **Fortinet, Inc.** is a Delaware corporation with its headquarters in Sunnyvale, California.  Fortinet provides cybersecurity solutions.  Fortinet's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and it trades on the NASDAQ exchange under the ticker "FTNT."

## TRADING TERMINOLOGY

21.     An investor who establishes a "long position" in a security generally expects the security to increase in value, and the investor will profit from an increase in value.  An investor who establishes a "short position" in a security generally expects the security to decrease in value, and the investor will profit from a decrease in value.

22.     In a "short sale," an investor borrows and sells stock that the investor does not own.  The investor must later buy the stock to return the borrowed shares.  An investor who sells short generally expects the price of the stock to decrease after the short sale, so the investor can profit from the difference between the higher sell price and the lower buy price.

23.     A stock options contract gives the owner the right to buy or sell a stock at a fixed price, known as the strike price, on or before a specified date, known as the expiration date.  A "call" option contract typically gives the owner the right to purchase 100 shares of the underlying stock at a strike price for a specified period of time.  A "put" option contract gives the

*SEC v. Brown, et al.*
Complaint

owner the right to sell 100 shares of the underlying stock at a strike price for a specified period of time.

## FACTS

**I.    The Infinera insider trading**

    **A.    Brown worked at Infinera and accessed material nonpublic information**

    24.    From approximately September 2011 through November 2017, Brown worked at Infinera as a senior revenue manager.  In that role, Brown worked on Infinera's quarterly accounting and financial reporting.  Brown was involved with, among other things, preparing and finalizing Infinera's quarterly financial results that were publicly reported.

    25.    During his employment at Infinera, Brown had access to confidential Infinera information, including financial results for completed quarters and financial projections or guidance for future quarters.  Before that information was disclosed to the public, Infinera's financial results and guidance constituted material nonpublic information.

    26.    On a quarterly basis, Infinera typically would announce—in press releases, earnings telephone calls, and SEC filings—its financial results for the just-completed quarter and financial guidance or projected results for the upcoming quarter.  At all relevant times, the company's public announcements of financial results and guidance generally occurred about one month after its fiscal quarter ended.  Infinera's financial results and guidance, when made public, typically affected the company's stock price.

    27.    During Brown's employment at Infinera, the company had an Insider Trading Compliance Program.  The program stated that certain categories of information are "particularly sensitive and, as a general rule, should always be considered material."  Those categories of material information included "Financial results," "Known but unannounced earnings or losses," and "Expected earnings or losses not reflected in Wall Street analysts' forecasts."  The program prohibited Infinera employees from trading on the basis of material nonpublic information and disclosing that information to others outside the company.  Brown completed training on Infinera's Insider Trading Compliance Program in 2012, 2014, 2015, 2016, and 2017.

28.     Accordingly, at all relevant times, Brown knew, or was reckless in not knowing, that Infinera's financial results and guidance constituted material nonpublic information, and that he had a duty to maintain the confidentiality of Infinera's material nonpublic information and not disclose that information outside the company.

**B.     The Infinera tipping chain**

29.     From at least April 2016 through November 2017, Brown repeatedly tipped material nonpublic information about Infinera's quarterly earnings announcements—including financial results for just-completed quarters and guidance for future quarters—to his close friend, Wylam.  Brown tipped Wylam in exchange for personal benefits or with the expectation of personal benefits.  Additionally, Brown knew, or was reckless in not knowing, that Wylam would use the tipped information to purchase or sell Infinera securities.  Wylam purchased and sold Infinera securities on the basis of the material nonpublic information provided by Brown.

30.     During the same period of time, April 2016 through November 2017, Wylam repeatedly tipped his close friend, Sood, with the material nonpublic information provided by Brown.  Wylam tipped Sood in exchange for personal benefits or with the expectation of personal benefits.  Additionally, Wylam knew, or was reckless in not knowing, that Sood would use the tipped information to purchase or sell Infinera securities.  Sood owed Wylam a six-figure gambling debt, and Wylam knew that Sood could use profits generated from insider trading to pay off at least part of that debt.  Sood also knew that the material nonpublic information about Infinera came from Brown, who worked at Infinera.  Sood purchased and sold Infinera securities on the basis of the material nonpublic information provided by Wylam.

31.     During the same period of time, April 2016 through November 2017, Sood repeatedly tipped his close friends, Bannon, Rauch, and Ramaiya, with the material nonpublic information provided by Wylam.  Sood tipped his friends in exchange for personal benefits or with the expectation of personal benefits.  Additionally, Sood knew, or was reckless in not knowing, that Bannon, Rauch, and Ramaiya would use the tipped information to purchase or sell Infinera securities.  Bannon also tipped his close friend, Rauch, in exchange for personal benefits

or with the expectation of personal benefits.  Bannon, Rauch, and Ramaiya knew, consciously avoided knowing, or were reckless in not knowing, that the material nonpublic information about Infinera came from an Infinera employee.  Bannon, Rauch, and Ramaiya purchased and sold Infinera securities on the basis of the material nonpublic information provided by Sood.

32.     The chart below illustrates the flow of material nonpublic information concerning Infinera from the company's insider, Brown, to the Infinera traders:



33.     From April 2016 to November 2017, the Infinera traders received ill-gotten gains from trading Infinera securities based on material nonpublic information obtained from Brown. Wylam made illegal profits and avoided losses of approximately $999,959; Sood made illegal profits of approximately $215,310; Bannon made illegal profits of approximately $103,177; Rauch made illegal profits of approximately $64,115; and Ramaiya made illegal profits and avoided losses of approximately $26,230.

34.     Although Brown did not trade Infinera securities, he tipped his close friend, Wylam, who traded.  According to Brown, his friendship with Wylam led him to breach his duty to maintain the confidentiality of Infinera's material nonpublic information.  In addition, as described below, Wylam compensated Brown for the tips.

*SEC v. Brown, et al.*
Complaint

**C.      Defendants engaged in insider trading around Infinera's April 2016 earnings announcement**

35.      In 2015, Brown learned that Wylam bought Infinera securities shortly before the company's earnings announcements and sold them soon after the announcements for short-term profits.  In connection with at least some of those purchases, Wylam asked Brown whether there was anything he should be "worried about"—meaning Wylam wanted to know if Infinera's announcements would include negative news—but Brown did not provide material nonpublic information at that time.  Nevertheless, as a result of those conversations, by early 2016, Brown knew, consciously avoided knowing, or was reckless in not knowing, that Wylam wanted Brown to supply material nonpublic information about Infinera, and that Wylam intended to trade Infinera securities on the basis of that information.

36.      Infinera's first quarter of 2016 ended on March 26, 2016.  Over the next several weeks, Brown and others worked to finalize Infinera's financial results and prepare for the public announcement of the company's first quarter results and guidance for the second quarter, which would occur on April 27, 2016.

37.      From approximately April 13 to 17, 2016, Brown and Wylam took a trip to Hawaii to celebrate their birthdays.  Wylam paid for the airfare and hotel for himself and Brown. At the time of the trip, Wylam had a long position in Infinera stock—he owned 11,250 shares.

38.      Around the time of the Hawaii trip, through his employment at Infinera, Brown knew the substance of Infinera's first quarter financial results and revenue guidance for the second quarter.  Brown also knew that the financial results and guidance were material nonpublic information, and that Infinera's announcement would be negative news.

39.      During or shortly after the Hawaii trip, in violation of Brown's duty of trust and confidence to Infinera, Brown told Wylam the substance of Infinera's not-yet-announced first quarter financial results and guidance for the upcoming quarter.  Brown knew, or was reckless in not knowing, that Wylam would trade Infinera securities on the basis of that material nonpublic information.

40.     After receiving the material nonpublic information from Brown about Infinera's upcoming first quarter announcement—and learning that the announcement would be negative—Wylam sold all of his Infinera stock and took a short position in Infinera securities.  On April 25, 2016, Wylam sold the 11,250 Infinera shares that he owned and used the proceeds to sell short 13,000 Infinera shares.

41.     The next day, April 26, at approximately 8:36 a.m. PT, Wylam used all the remaining purchasing power in his margin account to sell short 220 more Infinera shares.  About an hour later, Wylam deposited another $9,800 into his savings account, which he immediately transferred to his brokerage account.  Wylam then sold short an additional 1,250 Infinera shares.

42.     In total, Wylam accumulated a short position of 14,470 Infinera shares, at a cost of about $212,000, before Infinera's first quarter announcement.

43.     Wylam knew, since well before April 2016, that Brown worked for Infinera.  Additionally, in connection with Infinera's earnings announcements from April 2016 through November 2017, Wylam knew, or was reckless in not knowing, that Brown violated his duty of trust and confidence to Infinera by informing Wylam about the substance of Infinera's nonpublic financial results and guidance.

44.     Wylam also tipped Sood about the substance of Infinera's upcoming first quarter 2016 earnings announcement.  After receiving the material nonpublic information from Wylam, Sood used his parents' trust account—of which Sood was a beneficiary—to take a short position in Infinera securities.  On April 27, 2016, Sood sold short 2,000 Infinera shares, at a cost of about $30,543, before Infinera's negative first quarter announcement.  That was the first time Sood ever purchased or sold Infinera securities.

45.     Sood knew, or was reckless in not knowing, that the substance of Infinera's not-yet-announced financial results and guidance was material nonpublic information, and that it came from an Infinera insider (Brown) in violation of a duty of trust and confidence to the company.

46.     Sood, in turn, tipped Ramaiya about the substance of Infinera's upcoming first quarter announcement.  After receiving the material nonpublic information from Sood, Ramaiya also took a short position in Infinera securities.  On April 27, 2016, Ramaiya purchased 30 Infinera put option contracts.

47.     From his communications with Sood, Ramaiya knew, consciously avoided knowing, or was reckless in not knowing, that the substance of Infinera's not-yet-announced financial results and guidance was material nonpublic information, and that it came from an Infinera insider in violation of a duty of trust and confidence to the company.

48.     On April 27, 2016, Infinera's stock price closed at $15.57 per share.  That same day, after the stock market closed, Infinera publicly announced the financial results for its first quarter ended March 26, 2016, and disappointing revenue guidance for its second quarter. Specifically, during an April 27 earnings call, Infinera's Chief Financial Officer ("CFO") stated that the company projected second quarter revenue to be "$255 million, plus or minus $5 million," and that Infinera was "disappointed with this outlook."  The next day, April 28, 2016, Infinera's stock price closed at $12.01 per share, a drop of 23% from the prior day.

49.     After Infinera's stock price dropped as a result of the April 27 announcement, Wylam profited and avoided losses in the amount of approximately $65,448; Ramaiya profited in the amount of approximately $4,650; and Sood profited in the amount of approximately $3,543.

**D.     Defendants engaged in insider trading around Infinera's July 2016 earnings announcement**

50.     Infinera's second quarter of 2016 ended on June 25, 2016.  Over approximately the next month, Brown and others worked to prepare Infinera's second quarter financial results, which would be announced, along with guidance for the third quarter, on July 27, 2016.

51.     In mid-July 2016, about ten to fourteen days before Infinera announced its second quarter financial results and guidance, Brown attended a confidential Infinera meeting with, among others, Infinera's CFO.  In the meeting, the attendees discussed that, while Infinera's revenue for the second quarter was about $258 million, its revenue guidance for the next quarter

would be only about $175 million.  According to Brown, when he learned of the poor revenue guidance for Infinera's third quarter, he "knew it was bad news" and a "disaster."  Brown also knew that Infinera's financial results and guidance discussed in the meeting constituted material nonpublic information.

52.     About two days after attending the meeting with Infinera's CFO, Brown received a telephone call from Wylam.  On the call, Wylam indicated that he was going to buy Infinera securities in advance of the company's second quarter earnings announcement.  Brown, however, knew that Infinera's announcement would be negative, and so he warned Wylam not to purchase Infinera stock.  According to Brown, he informed Wylam that Infinera's second quarter financial results, and guidance for the next quarter, were "not going to be pretty."  Brown also told Wylam that Infinera's revenue guidance for the third quarter would be "really bad news."

53.     Brown knew that he was not allowed to share Infinera's material nonpublic information with Wylam, but Brown tipped Wylam anyway.  According to Brown, his desire to help Wylam overrode his duty of trust and confidence to Infinera.

54.     After receiving the material nonpublic information from Brown about Infinera's upcoming second quarter announcement—and learning that the announcement would be negative—Wylam built a large short position.  Between July 11 and July 27, 2016, Wylam sold the 6,500 Infinera shares that he owned, sold short 17,900 Infinera shares, and purchased 3,936 Infinera put option contracts.  In total, Wylam spent $326,000 accumulating a short position before Infinera's negative second quarter announcement.

55.     July 2016 was the first time Wylam ever traded stock options in any company.  Wylam was first approved to trade options by his brokerage firm on July 19, 2016.

56.     Additionally, Wylam tipped Sood about the substance of Infinera's upcoming second quarter announcement.  After receiving the material nonpublic information, Sood also took a short position in Infinera securities.  On July 15, 2016, Sood opened an individual brokerage account.  Then, between July 19 and July 27, 2016, Sood sold short 4,500 Infinera

shares and purchased 650 Infinera put option contracts.  In total, Sood spent about $73,000 building a short position before Infinera's negative second quarter announcement.

57.     July 2016 was the first time Sood ever traded stock options in any company.  He was approved for options trading by his brokerage firm on July 18, 2016.

58.     Sood knew, consciously avoided knowing, or was reckless in not knowing, that the information he received from Wylam was material nonpublic information, and that it came from an Infinera insider (Brown) in violation of a duty of trust and confidence to the company.

59.     Sood, in turn, tipped Ramaiya, Bannon, and Rauch about the substance of Infinera's upcoming second quarter announcement.  After receiving the material nonpublic information, Ramaiya, Bannon, and Rauch also took short positions in Infinera securities.  Specifically, Ramaiya purchased 60 Infinera put option contracts, Bannon purchased 300 Infinera put option contracts, and Rauch sold short 10,000 Infinera shares.  Ramaiya, Bannon, and Rauch spent approximately $2,040, $10,750, and $127,329, respectively, accumulating short positions before Infinera's negative second quarter announcement.

60.     July 2016 was the first time Bannon ever purchased or sold Infinera securities.

61.     July 2016 also was the first time Rauch ever purchased or sold Infinera securities, and the first time Rauch ever sold short the stock of any company.  Rauch was approved by his brokerage firm for a margin account—which he used to short sell Infinera shares—on or about July 26, 2016.

62.     Ramaiya, Bannon, and Rauch knew—from their communications with Sood—that the information about Infinera's upcoming announcement came from an insider at the company.  Thus, Ramaiya, Bannon, and Rauch knew, consciously avoided knowing, or were reckless in not knowing, that the substance of Infinera's not-yet-announced financial results and guidance was material nonpublic information, and that it came from an Infinera insider in violation of a duty of trust and confidence to the company.

63.     On July 27, 2016, Infinera's stock price closed at $12.51 per share.  That same day, after the stock market closed, Infinera publicly announced its financial results for its second

quarter ended June 25, 2016, and disappointing revenue guidance for its third quarter of 2016. Specifically, on a July 27 earnings call, Infinera's CFO stated that the company projected revenue to be "$185 million, plus or minus $5 million," and that "we are very disappointed with this outlook."  The next day after that announcement, July 28, 2016, Infinera's stock price closed at $8.31 per share, a drop of 33% from the prior day's closing price.

64.    After Infinera's stock price dropped as a result of the July 27 announcement, Wylam profited and avoided losses in the amount of approximately $884,881; Sood profited in the amount of approximately $175,312; Bannon profited in the amount of approximately $78,850; Rauch profited in the amount of approximately $44,339; and Ramaiya profited in the amount of approximately $11,410.

65.    On or around July 28, 2016, Wylam sent Brown a screenshot of Wylam's brokerage account, showing the balance after Infinera's July 27 announcement, including the profits that Wylam made purchasing Infinera put options before the announcement.  According to Brown, he did a "double-take" "because the number was so big."

66.    Shortly after seeing the screenshot of Wylam's account on July 28, Brown called Wylam on the telephone.  During the call, Wylam explained how he made such large profits purchasing Infinera put options before the July 27 announcement.  Brown "flipped out" because, in his view, the massive size of Wylam's trades and profits raised an "obvious red flag."

67.    After the July 28 call, in order to cover up his role in tipping material nonpublic information to Wylam, Brown deleted Wylam from his Facebook account and deleted his emails with Wylam.

68.    Also after the July 28 call with Wylam, Brown told his then-girlfriend what happened.  Brown explained that he tipped Wylam, that Wylam used the information to trade and make "nearly a million dollars," and that Brown was "really worried."

69.    After several days of panic around late July 2016, Brown decided to continue his friendship with Wylam.  According to Brown, he hoped that his tipping and Wylam's trading would not "come back and bite us."

70.     On August 5, 2016, Brown—whose tips enabled his friend, Wylam, to make nearly one million dollars—texted his then-girlfriend to inform her that he was going to Wylam's house to, among other things, "talk to him about $."  One week later, on or around August 12, Brown took a photograph of numerous one hundred dollar bills spread across his bathroom sink.

71.     On or about October 10, 2016, Wylam took Brown to a San Francisco Giants playoff game.  Wylam bought both tickets—for seats only a few feet from the field—and paid more than $2,500 for each ticket.  Brown understood that Wylam bought the tickets, at least in part, to thank Brown for providing inside information about Infinera.

**E.     Defendants continued insider trading around Infinera earnings announcements through November 2017**

72.     The Infinera insider trading scheme continued for several more Infinera earnings announcements through November 2017.  For example, in July 2017, using material nonpublic information provided by Brown, the Infinera traders traded in advance of Infinera's second quarter earnings announcement on August 3, 2017.

73.     On July 1, 2017, Infinera's second quarter of 2017 ended.  Over the next month, in the course of his employment, Brown learned the substance of Infinera's nonpublic second quarter financial results and guidance for the next quarter.

74.     On July 24, 2017, Wylam sent a WhatsApp message to Sood, stating that "[Infinera] pushed the report to August 3rd . . . [N]ate [Brown] is flying back from NZ today.  I'll definitely get the full scoop and as soon as I know I'll let you know. . . .  [H]opefully we'll make some real $$."

75.     One week later, on August 1, 2017, Wylam sent another WhatsApp message to Sood, stating "Ok so we ended at $176.8m [in revenue] for Q2.  Street wanted $180-183m so q2 is a miss.  Q3 guidance im [sic] not sure.  Last roll up was $195m, and i [sic] see street expects $197m ($$189 – 205m)."  Later that day, on August 1, Wylam sent another WhatsApp message to Sood, stating "Got the guidance . . . rolling up to 188M for q3 . . . street wants 197M."

76.     The information in Wylam's August 1, 2017 WhatsApp messages—referencing Infinera's revenue for the second quarter and guidance for the third quarter, and indicating that Infinera would miss Wall Street's expectations for the company—came from Brown.  Brown provided that information to Wylam knowing, consciously avoiding knowing, or recklessly not knowing, that it was material nonpublic information; that providing such information to Wylam breached Brown's duty of trust and confidence to Infinera; and that Wylam would use the information to trade Infinera securities.

77.     After receiving the material nonpublic information, Wylam purchased Infinera securities.  On August 3, 2017, Wylam purchased 350 Infinera put option contracts.  Wylam spent approximately $19,250 accumulating a short position before Infinera's negative second quarter announcement.

78.     Wylam also passed the material nonpublic information to Sood via WhatsApp messages, knowing, or recklessly not knowing, that Sood would use the information to purchase or sell Infinera securities.  After receiving the material nonpublic information, Sood purchased Infinera securities.  Between July 6 and August 3, 2017, Sood sold short 1,400 Infinera shares and purchased 720 Infinera put option contracts.  In total, Sood spent approximately $51,869 building his short position before Infinera's negative second quarter announcement.

79.     Sood, in turn, passed the material nonpublic information to Ramaiya, Bannon, and Rauch, knowing,, or recklessly not knowing, that they would use the information to trade Infinera securities.  After receiving the material nonpublic information, Ramaiya, Bannon, and Rauch purchased Infinera securities.  Ramaiya purchased 170 Infinera put option contracts, Bannon purchased 170 Infinera put option contracts, and Rauch purchased 120 Infinera put option contracts.  In total, Ramaiya, Bannon, and Rauch spent $6,950, $6,675, and $4,945, respectively, building short positions before Infinera's negative second quarter announcement.

80.     On August 3, 2017, Infinera's stock price closed at $11.47 per share.  That same day, after the stock market closed, Infinera publicly announced its financial results for the second quarter ended July 1, 2017, which included disappointing revenues, and lower-than-expected

revenue guidance for the third quarter.  Specifically, in an earnings call on August 3, Infinera executives announced second quarter revenue of $177 million, which was "at the lower end of our guidance range," and projected third quarter revenue of $190 million, plus or minus $5 million, which was "below our expectations from earlier in the year."   The day after that announcement, August 4, 2017, Infinera's stock price closed at $9.57 per share, a drop of 19% from the prior day.

81.   After Infinera's stock price dropped as a result of the August 3 announcement, Wylam profited in the amount of approximately $36,750; Sood profited in the amount of approximately $36,455; Rauch profited in the amount of approximately $13,580; Bannon profited in the amount of approximately $9,225; and Ramaiya profited in the amount of approximately $7,010.

82.   The Infinera insider trading scheme ended in November 2017, when Brown lost his job at Infinera.

**II.    The Fortinet insider trading**

  **A.    Bannon worked at Fortinet and learned material nonpublic information**

83.   From approximately January 2011 through at least 2017, Bannon worked at Fortinet as a major account manager for North American sales.  In that role, Bannon directed and managed Fortinet's North American sales efforts with various Fortune 1000 companies.

84.   At all relevant times, on a quarterly basis, Fortinet announced its financial results for the just-completed quarter and guidance for projected results in the upcoming quarter.  The public announcement generally occurred about one month after the fiscal quarter ended.

85.   During Bannon's employment at Fortinet, the company had an Insider Trading Policy.  The policy stated that material nonpublic information included, among other things, unannounced "financial results, financial condition, earnings pre-announcements, guidance, projections or forecasts, particularly if inconsistent with the expectations of the investment community."  The policy prohibited Fortinet employees from trading on the basis of material

1  nonpublic information and disclosing that information to others outside the company.  Bannon

2  completed training on Fortinet's Insider Trading Policy in 2012, 2013, 2014, and 2016.

3       86.     Accordingly, at all relevant times, Bannon knew, or was reckless in not knowing,

4  that Fortinet's financial results and guidance constituted material nonpublic information, and that

5  he had a duty to maintain the confidentiality of Fortinet's material nonpublic information and not

6  disclose that information outside the company.

7         **B.**     **The Fortinet tipping chain**

8       87.     In or around early October 2016, as detailed below, Bannon learned that Fortinet

9  was going to make an early and unexpected public announcement of preliminary financial results

10  for its third quarter of 2016, and that the results would be negative.  Bannon knew, or was

11  reckless in not knowing, that the unexpected announcement, and its substance, constituted

12  material nonpublic information.  But in violation of his duty of trust and confidence to Fortinet,

13  Bannon tipped that information to his close friend, Sood.

14       88.     Bannon tipped Sood in exchange for personal benefits or with the expectation of

15  personal benefits.  Additionally, Bannon knew, or was reckless in not knowing, that Sood would

16  use the tipped this information to purchase or sell Fortinet securities.  Sood purchased Fortinet

17  securities on the basis of the material nonpublic information provided by Bannon.

18       89.     After receiving the material nonpublic information about Fortinet, Sood tipped his

19  close friends, Wylam and Ramaiya.  Sood tipped his friends in exchange for personal benefits or

20  with the expectation of personal benefits.  And Sood knew, or was reckless in not knowing, that

21  Wylam and Ramaiya would use this information to trade Fortinet securities.  Sood also owed

22  Wylam a six-figure gambling debt, and Sood expected that, in return for providing inside

23  information, Wylam would forgive a portion of the debt.  From their communications with Sood,

24  Wylam and Ramaiya knew, consciously avoided knowing, or were reckless in not knowing, that

25  the material nonpublic information came from a Fortinet insider.  Wylam and Ramaiya

26  purchased and sold Fortinet securities on the basis of the material nonpublic information

27  provided by Sood.

*SEC v. Brown, et al.*
Complaint

90.     The chart below illustrates the flow of material nonpublic information concerning

Fortinet from the company's insider, Bannon, to the Fortinet traders:



91.     The Fortinet traders used the material nonpublic information they received to

generate ill-gotten profits by purchasing and selling Fortinet securities in advance of the

unexpected October 2016 announcement.  Sood made illegal profits of approximately $178,320;

Wylam made illegal profits of approximately $86,293; and Ramaiya made illegal profits of

approximately $6,660.

**C.      Defendants engaged in insider trading around Fortinet's unexpected October 2016 announcement**

92.     Fortinet's third quarter of 2016 ended on September 30, 2016.  Under Fortinet's

normal procedures, the company was scheduled to report its third quarter financial results on or

around October 27, 2016.

93.     In early October 2016, however, Fortinet decided to make an unexpected

announcement of preliminary third quarter results.  The announcement would disclose that

Fortinet expected to fall short of its previously-issued guidance for billings, revenue, and

earnings per share.  The fact that Fortinet planned an unexpected announcement of preliminary

third quarter results—and that the results would be negative—was material nonpublic

information.

94.     Bannon, who was employed by Fortinet at this time, learned of the unexpected

announcement and knew that it would be negative news.  When asked by the SEC about how he

obtained this material nonpublic information, Bannon invoked his Fifth Amendment privilege

1   against self-incrimination and refused to answer.  In any event, Bannon knew, or was reckless in

2   not knowing, that he had a duty to Fortinet to maintain the confidentiality of the company's

3   material nonpublic information.

4        95.     In violation of Bannon's duty of trust and confidence to Fortinet, Bannon

5   conveyed to Sood the material nonpublic information that Fortinet was planning an unexpected

6   third quarter earnings announcement, and that it would be negative.  On October 3, 2016,

7   beginning at 2:56 p.m. PT (after the stock market closed), Bannon and Sood exchanged four text

8   messages.  Bannon knew, or was reckless in not knowing, that Sood would trade Fortinet

9   securities on the basis of that material nonpublic information.

10       96.     After receiving from Bannon material nonpublic information about the

11  unexpected Fortinet announcement, Sood purchased Fortinet securities to profit from the

12  negative news.  On October 4, 2016, the day after receiving the texts from Bannon, Sood

13  purchased 250 Fortinet put option contracts with an expiration date in October 2016.

14       97.     Sood knew that Bannon worked for Fortinet.  Sood also knew, consciously

15  avoided knowing, or was reckless in not knowing, that Bannon violated his duty of trust and

16  confidence to Fortinet by informing Sood about the substance of Fortinet's unexpected earnings

17  announcement.

18       98.     Additionally, Sood tipped Ramaiya about the substance of Fortinet's unexpected

19  announcement.  From his communications with Sood, Ramaiya knew, consciously avoided

20  knowing, or was reckless in not knowing, that the information about the unexpected

21  announcement came from a Fortinet insider.  After receiving the material nonpublic information,

22  Ramaiya purchased Fortinet securities.  On October 4, 2016, the same day that Sood purchased

23  Fortinet put option contracts, Ramaiya also purchased 10 Fortinet put option contracts.

24       99.     From October 4 to the date of the unexpected announcement, October 11, 2016,

25  Sood purchased 650 Fortinet put option contracts, and Ramaiya purchased 30 Fortinet put option

26  contracts.

27

100.     Sood also tipped Wylam about the substance of Fortinet's unexpected announcement.  On October 10, 2016, after the stock market closed for the day, Sood sent a WhatsApp message to Wylam, stating that Fortinet was "going to come out pre earnings and say they are gonna miss."  Moments later, Sood sent another WhatsApp message to Wylam, stating "thats what my contact says."  Wylam knew, from his communications with Sood, that Sood's "contact" was a Fortinet insider.

101.     On October 11, 2016, the morning after receiving the WhatsApp messages from Sood, Wylam sold short 20,000 Fortinet shares for a total cost of approximately $682,957.  That was the first time Wylam ever purchased or sold Fortinet securities.

102.     On October 11, 2016, Fortinet's stock price closed at $34.09 per share.  That same day, after the stock market closed, Fortinet publicly announced its unexpected and negative preliminary third quarter results.  Among other things, Fortinet announced that it expected (i) quarterly billings "in the range of $343 million to $348 million compared to our previously announced guidance of $372 million to $376 million;" (ii) quarterly revenue "in the range of $311 million to $316 million compared to our previously announced guidance of $319 million to $324 million;" and earnings per share "to be $0.15 to $0.16 compared to our previously announced guidance of $0.17 to $0.18."  The next day after that announcement, October 12, 2016, Fortinet's stock price closed at $30.66 per share, a drop of 10% from the prior day.

103.     After Fortinet's stock price dropped as a result of the unexpected October 11 announcement, Sood profited in the amount of approximately $178,312; Wylam profited in the amount of approximately $86,293; and Ramaiya profited in the amount of approximately $6,660.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants)**

104.     All of the foregoing paragraphs are re-alleged and incorporated by reference.

105.     As set forth above, Brown and Bannon owed a duty of trust or confidence to their employers, Infinera and Fortinet, respectively, to maintain the confidentiality of their employers'

material nonpublic information.  In breach of that duty, Brown and Bannon communicated material nonpublic information about their employers to the other Defendants while knowing, or recklessly not knowing, that the other Defendants would purchase or sell securities on the basis of that information.  Brown and Bannon communicated material nonpublic information to the other Defendants in exchange for personal benefits or with the expectation of receiving personal benefits.

106.    As set forth above, Wylam, Sood, Bannon, Rauch, and Ramaiya purchased or sold Infinera and Fortinet securities on the basis of material nonpublic information provided by Brown and Bannon.  Wylam, Sood, Bannon, Rauch, and Ramaiya knew, consciously avoided knowing, or were reckless in not knowing, that the material nonpublic information about Infinera and Fortinet was communicated in breach of a duty of trust or confidence.

107.    By the conduct alleged in this Complaint, each Defendant, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, and acting knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made material misstatements or omissions; or (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon other persons.

108.    Each Defendant thus violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Unless restrained and enjoined, Defendants will continue to violate those provisions of the federal securities laws.

**PRAYER FOR RELIEF**

Accordingly, the SEC respectfully requests that the Court grant the following relief:

A.    Permanently enjoin each Defendant from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

B.    Order each Defendant to pay civil monetary penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1; and

C.    Grant such further relief as the Court deems appropriate.

*SEC v. Brown, et al.*
Complaint

| | |
|---|---|
| 1 | **DEMAND FOR JURY TRIAL** |
| 2 | The SEC hereby demands a jury trial. |
| 3 | Respectfully submitted, |
| 4 | Date:  June 15, 2021 |

/s/ Alfred A. Day
Alfred A. Day (Mass. Bar No. 654436)
daya@sec.gov
(617) 573-4537
Timothy K. Halloran (D.C. Bar No. 483245)
hallorant@sec.gov
(202) 551-4414

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Facsimile:  (202) 772-9292

Of Counsel:

Paul E. Kim
David Bennett
Colby A. Steele
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549

*SEC v. Brown, et al.*
Complaint